# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-60686

United States Court of Appeals
Fifth Circuit

**FILED**

November 25, 2020

Lyle W. Cayce
Clerk

LEONILO RETANA LEYVA,

Petitioner,

v.

WILLIAM P. BARR, U. S. ATTORNEY GENERAL,

Respondent.

Petition for Review of an Order of
the Board of Immigration Appeals
No. A209 411 752

Before OWEN, Chief Judge, and JONES and STEWART, Circuit Judges.

PER CURIAM:*

Leonilo Retana Leyva (Retana) petitions for review of decisions of the Board of Immigration Appeals (BIA) dismissing his appeal of the decision of the Immigration Judge (IJ) ordering Retana's removal and denying his motion to reopen. We affirm.

**I**

On September 7, 2016, Department of Homeland Security (DHS or Government) officer B. Fauble completed a Form I-213 using information

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-60686

provided by Johnson County Detention Center detainee Leonilo Retana Leyva. The I-213 states that Retana is a citizen and national of Mexico who illegally entered the United States in 2003. That same day, DHS served Retana with a Notice to Appear (NTA) charging him with being illegally present in the United States.

Retana appeared pro se before the IJ on September 29, 2016, and October 5, 2016. At those hearings, Retana stated that he understood he was attending immigration proceedings and that he understood his rights as explained to him. However, at both hearings, Retana displayed some confusion as to his situation. At the first hearing, when asked whether he knew the Government was trying to deport him, Retana stated, "I don't—I didn't know that. This case—I don't have to worry about it because I don't owe anything. The person—the other person is the one that owes everything to the Government." At the second hearing, when asked the same question, he answered, "no." Additionally, at both hearings, Retana mentioned that he was experiencing seizures. At the end of the October 5 hearing, the IJ ordered the Government to conduct a competency exam on Retana.

At a hearing on October 20, 2016, Retana answered a number of biographical questions. When asked if he knew why he was in immigration proceedings, Retana answered "Yes. The reason is because I have been for a long time already [indiscernible] and I guess that's why Immigration came for me there." At that point in the hearing, the IJ determined that Retana understood the nature of the proceedings, but stated that he would continue to determine whether Retana fully appreciated the proceedings. Further conversation with Retana revealed that he was experiencing some confusion.

No. 17-60686

For example, when the IJ asked Retana whether he believed he was in the United States illegally, Retana answered,

> Well, I'm going to tell you one thing. When I came the first time I asked God that if it was His will for me to come—and I told Him that and so when that Immigration dog came to me I told the dog don't bite me, don't harm me and don't tell on me that I am here and when I told him that immediately the dog left.

After Retana's confusion became evident, the IJ determined that Retana was not competent to proceed by himself and that his recent seizures may have affected his ability to think clearly and participate adequately in the proceedings. The IJ continued the case and ordered the Government to provide the mental health evaluation performed upon his initial detention. Retana then had a seizure in full view of the court, and the hearing ended.

DHS complied with the IJ's order by producing the Mental Health Review prepared by Dr. Erica Swicegood on September 14, 2016. The Mental Health Review stated, *inter alia*, that Retana had "no stated mental health history," "denie[d] all psychiatric symptoms," "[d]enie[d] previous hospitalizations . . . [and] medications," was not currently in psychiatric treatment, made "good eye contact," was "goal directed" and "alert," and had "fair" judgment.

Retana next appeared before the IJ represented by pro bono counsel. The IJ granted a short continuance to give counsel time to become familiar with the case. At Retana's next hearing, counsel objected to the IJ's request for Retana to state his full name, stating that Retana was disputing his identity and alienage based on his mental competency issues. Counsel also filed three motions: (1) a motion to terminate the proceedings with prejudice based on improper service of the NTA; (2) a motion for "psychological, neurological and IQ test evaluations" paid for by the Government; and (3) a motion for a continuance to obtain a competency evaluation and to contact various medical

3

providers. At the end of the hearing, the Government served Retana's counsel with the NTA.

At Retana's next hearing, the IJ issued an oral decision denying Retana's motions for termination of the proceedings and for testing at government expense. After receiving that decision, Retana's counsel moved to terminate the proceedings on the basis that a state-appointed guardian was necessary to protect Retana's rights. The IJ denied that motion as well. Next, Retana's counsel denied the charge against Retana. The Government responded by submitting the I-213 to establish alienage. Counsel objected to the use of the I-213, arguing that it is unreliable because Retana, who provided the information in the I-213, has been found to be mentally incompetent. The IJ overruled the objection. Retana's counsel then moved for a brief continuance to obtain additional medical records. The IJ granted the motion.

At Retana's next and final hearing, Retana's counsel proffered documents purportedly showing that Retana had "a growth in his brain, probably worms which require surgery." Retana asked for a continuance to contact Dr. Chadwell, who allegedly had information about Retana's condition and the reliability of his memory at the time the I-213 was prepared. The IJ denied the motion. The IJ then determined that the charge against Retana had been established and that he was removable.

The IJ issued a written decision explaining his various rulings and ordering that Retana be removed from the United States. Retana appealed that decision to the BIA, which dismissed Retana's appeal. Retana petitioned this court for review of the BIA's decision.

Retana subsequently filed a motion to reopen the case with the BIA, attaching a document in which Dr. Swicegood, the doctor who generated Retana's Mental Health Review, stated that she did not assess Retana's competency. The BIA denied the motion to reopen. Retana petitioned this

No. 17-60686

court to review that decision. Retana's counsel represents that Retana was deported to Mexico without counsel's knowledge prior to the filing of the motion to reopen.

## II

Retana first contends that the BIA erred in upholding the IJ's denial of his motion to dismiss based on defects in the service of the NTA, which Retana contends violated the regulations governing the service of NTAs as well as his right to due process.

A federal statute, 8 U.S.C. § 1229(a), requires the Government to provide aliens written notice of removal proceedings in person, or, if personal service is not practicable, through service by regular mail to the alien or the alien's counsel.[1] DHS regulations provide specific instructions for the service of aliens depending on their competency to understand the proceedings initiated against them and confinement in a penal or mental institution. Under 8 C.F.R. § 103.8(c)(2),

> (i) . . . If a person is confined in a penal or mental institution or hospital and is competent to understand the nature of the proceedings initiated against him, service shall be made both upon him and upon the person in charge of the institution or the hospital. If the confined person is not competent to understand, service shall be made only on the person in charge of the institution or hospital in which he is confined, such service being deemed service on the confined person.
>
> (ii) . . . In case of mental incompetency, whether . . . confined in an institution . . . service shall be made upon the person with whom the incompetent . . . resides; whenever possible, service shall also be made on the near relative, guardian, committee, or friend.

---

[1] 8 U.S.C. § 1229(a); *see also* 8 C.F.R. § 1003.13 ("[A] Notice to Appear . . . shall be served to the alien in person, or if personal service is not practicable, shall be served by regular mail to the alien or the alien's attorney of record.").

No. 17-60686

The BIA set forth its interpretation of these regulations in *Matter of E-S-I-*.[2] The BIA noted that the regulations prescribe different methods of service for aliens who are competent to understand the proceedings against them and aliens who are not.[3] The BIA "recognize[d], however, that the DHS is often not able to determine at the time that it serves the notice to appear whether the respondent's case is a 'case of mental incompetency,'" as that term is used in 8 C.F.R. § 103.8(c)(2)(ii).[4] In light of this uncertainty, the BIA held that, when "DHS is aware of *indicia of incompetency* at the time it serves the notice to appear, the case should be handled as 'a case of mental incompetency,' and the respondent should be served in accordance with 8 C.F.R. §§ 103.8(c)(2)(i) and (ii)."[5]

The BIA also discussed cases in which "competency issues manifest after service of the notice to appear."[6] The BIA observed that "[m]ental competency is a variable condition"[7] and that, accordingly, "the longer the period of time that has elapsed since service of the notice to appear, the more difficult it becomes to gauge whether an individual was competent at the time of service."[8] The BIA then provided explicit instructions based on the time that elapsed between service of the NTA and the manifestation of indicia of incompetency.[9] If indicia of incompetency arise "shortly after service of the notice to appear . . . the DHS should be granted a continuance to serve the notice to appear in accordance with [§ 103.8(c)(2)] and this decision."[10] If the indicia of

---

[2] 26 I. & N. Dec. 136, 140 (BIA 2013).

[3] *Id.*

[4] *Id.* at 144 (quoting 8 C.F.R. § 103.8(c)(2)(ii)).

[5] *Id.* (emphasis added).

[6] *Id.* (capitalization omitted).

[7] *Id.* (citing *Matter of M-A-M-*, 25 I. & N. Dec. 474, 480 (BIA 2011)).

[8] *Id.*

[9] *Id.* at 144-45.

[10] *Id.* at 144.

incompetency arise at a later date, the IJ should "consider whether a new service of the notice to appear pursuant to 8 C.F.R. §§ 103.8(c)(2)(i) and (ii) would be among the safeguards needed for the case to proceed" and, if so, "should grant the DHS a continuance for that purpose."[11]

## A

Retana contends that the Government was aware of sufficient indicia of incompetency at the time of the service of the NTA to trigger the Government's obligation to comply with § 103.8(c)(2). Specifically, Retana argues that his "slow speech and motor skills as well as his illiteracy were manifest indicia of his incompetency that the DHS officer processing his case must have recognized." Retana, however, does not cite any evidence in the record in support of that assertion. Further, the IJ interacted with Retana on multiple occasions and considered those interactions when coming to his conclusion. Retana has not presented clear evidence of the exact facts that qualify as indicia of his incompetency or the Government's awareness of those facts prior to service of the NTA. Therefore, we will not overturn the IJ's conclusion that, at the time the NTA was served, Retana did not display sufficient indicia of incompetency to trigger § 103.8(c)(2).

Having decided that the obligation to comply with § 103.8(c)(2) did not arise until October 20, 2016, the IJ concluded that DHS "complied with *Matter of E-S-I-* and the regulations by personally serving the Warden of Johnson County Detention Center where Respondent is currently being detained." The IJ described the circumstances of the warden's service as follows: "Although not clear in its response, the NTA was apparently faxed to a Deportation Officer at Johnson County who personally served the Warden as evidenced by his signature."

---

[11] *Id.* at 144-45.

No. 17-60686

The BIA affirmed the IJ's ultimate conclusion—that service was not defective—but seems to have adopted a different rationale.

> [R]espondent also argues that the DHS's service of the NTA on the detention facility warden by facsimile was defective. . . .  We note that the applicable regulation provides for personal service in a number of ways, including by electronic mail. . . .  In any event, as the Immigration Judge noted, counsel was also personally served with the NTA in court on December 8, 2016 . . . .  We agree with the Immigration Judge that the respondent has not established any defect in service that warrants termination of proceedings.

The difference in the IJ and BIA decisions is important because "[w]e review the BIA's decision and only consider the IJ's decision to the extent that it influenced the BIA."[12]  Although there is some tension between the exact mode of service on the warden described by the IJ and the BIA rulings, there is no dispute that the NTA was received by the warden.  We affirm the BIA on the grounds discussed below, namely, that Retana has not demonstrated that he was prejudiced by the defective service.

## B

Although neither the BIA nor the IJ explicitly based its decision on any lack of prejudice, we read those decisions as coming to that conclusion.  The IJ concluded that DHS complied with § 103.8(c)(2) by personally serving the warden.  The BIA "agree[d] with the Immigration Judge that the respondent has not established any defect in service that warrants termination of proceedings," focusing on the personal service of Retana's counsel.  We read the BIA's statement that Retana "has not established any defect in service *that warrants termination of proceedings*" as based on the BIA's conclusion that Retana failed to establish any prejudice resulting from the alleged defects in the service of the NTA.  This reading is supported by the BIA's statement that,

---

[12] *Shaikh v. Holder*, 588 F.3d 861, 863 (5th Cir. 2009) (citing *Mikhael v. I.N.S.*, 115 F.3d 299, 302 (5th Cir. 1997)).

No. 17-60686

"[i]n any event, as the Immigration Judge noted, counsel was also personally served with the NTA in court on December 8, 2016." There is no argument that service on counsel could satisfy the regulations requiring service on a warden, so the BIA likely considered service on counsel when determining whether there had been any prejudice.

We agree that Retana has not demonstrated the requisite prejudice for a successful due process claim. Retana relies on *United States ex rel. Accardi v. Shaughnessy*[13] for the proposition that an agency's failure to follow its own regulations "violates due process and no showing of prejudice or harmful error is required." However, this circuit has explicitly read *Accardi* as establishing that "[f]ailure to adhere to regulations *can* constitute a denial of due process of law," not that it always does.[14] Rather, in this circuit, "[t]he failure of an agency to follow its own regulations is not . . . a per se denial of due process unless the regulation is required by the constitution or a statute."[15]

Accordingly, to decide whether a violation of § 103.8(c)(2) is a per se denial of due process such that an additional showing of prejudice is not required, we must decide whether the procedures imposed by § 103.8(c)(2) are required by a statute or the Constitution. Neither party makes any argument in this regard. The most relevant statute only requires the Government to provide aliens with written notice of removal proceedings in person, or, if personal service is not practicable, through service by regular mail to the alien or the alien's counsel.[16] Accordingly, Retana has not established that a violation of § 103.8(c)(2) is a per se violation of an alien's right to due process.

---

[13] 347 U.S. 260 (1954).

[14] *Arzanipour v. I.N.S.*, 866 F.2d 743, 746 (5th Cir. 1989) (emphasis added) (first citing *Accardi*, 347 U.S. 260; and then citing *Bridges v. Wixon*, 326 U.S. 135 (1945)).

[15] *Id.*

[16] *See* 8 U.S.C. § 1229(a).

No. 17-60686

Retana's alternative prejudice argument, that he suffered prejudice in the form of "his continued detention following such failure of proper service," misunderstands the type of prejudice that must be shown. In a removal proceeding, "[d]emonstration of prejudice requires the alien to show a reasonable likelihood that, but for the errors complained of, he would not have been removed."[17] Retana effectively argues that, but for the BIA's decision not to dismiss the proceedings against him due to the aforementioned service issues, the result of his proceedings would have been different. This is obviously true. However, the test for determining whether an alien would have been removed without "the errors complained of" in a motion to dismiss on due process grounds is not whether the proceedings would have been dismissed if that motion was granted—that is the case for all of the errors complained of in motions to dismiss on due process grounds. Rather, the test is whether the result would have been different but for the errors forming the basis of the motion,[18] in this case the manner in which the warden was served.

Retana makes no attempt to explain how the result of the proceeding would have been different if the warden was served in a different manner. Nor can he, as the purposes of serving the warden—"ensuring that an alien appears before the Immigration Court at the scheduled time"[19] and helping "the DHS and the Immigration Court identify someone who can assist the [alien] so that proceedings can go forward"[20]—were both met here. Retana was appointed counsel and there is no evidence that Retana ever missed any immigration hearings. Accordingly, we affirm the BIA on the ground that Retana has not demonstrated that he was prejudiced by any issues with the service of his NTA.

---

[17] *Nguyen v. Dist. Dir., Bureau of Immigr. & Customs Enf't*, 400 F.3d 255, 259 (5th Cir. 2005) (citing *United States v. Benitez–Villafuerte*, 186 F.3d 651, 658-59 (5th Cir. 1999)).

[18] *See id.*

[19] *Matter of Amaya-Castro*, 21 I. & N. Dec. 583, 585 (BIA 1996).

[20] *Matter of E-S-I-*, 26 I. & N. Dec. 136, 142 (BIA 2013).

No. 17-60686

## III

Retana contends that the BIA erred when it concluded that the IJ provided Retana with sufficient safeguards in light of his competency. Retana's argument is based on the IJ's refusal to appoint a guardian. The BIA rejected this argument on the ground that Retana "cites no legal authority to support the assertion that removal proceedings may not be initiated or continued against an incompetent respondent who has no state-appointed legal guardian."

The BIA cited its decision in *Matter of M-A-M-*[21] as establishing the safeguards that must be provided to incompetent respondents. The BIA began its discussion in *Matter of M-A-M-* by examining the text of 8 U.S.C. § 1229a(b)(3).[22] That statute states, "[i]f it is impracticable by reason of an alien's mental incompetency for the alien to be present at the proceeding, the Attorney General shall prescribe safeguards to protect the rights and privileges of the alien."[23] According to the BIA, § 1229a(b)(3)'s "invocation of safeguards presumes that proceedings can go forward, even whe[n] the alien is incompetent, provided the proceeding is conducted fairly."[24] The BIA identified a number of safeguards that have been required by regulation, including (1) requirements for the service of incompetent individuals (8 C.F.R. § 103.8); (2) regulations prohibiting IJs from "accept[ing] an admission of removability from an unrepresented respondent who is incompetent and unaccompanied" (8 C.F.R. § 240.10(c)); and, most relevant to the guardianship issue, (3) a regulation that permits a "legal representative or guardian, near relative, or friend" to appear on behalf of a respondent who cannot be present

---

[21] 25 I. & N. Dec. 474 (BIA 2011).
[22] *See M-A-M-*, 25 I. & N. Dec. at 477.
[23] 8 U.S.C. § 1229a(b)(3).
[24] *M-A-M-*, 25 I. & N. Dec. at 477.

(8 C.F.R. § 1240.4).[25]    The BIA concluded that, outside these required safeguards, "Immigration Judges have discretion to determine which safeguards are appropriate, given the particular circumstances in a case before them."[26]    The BIA provided a list of "appropriate safeguards" that included both "managing the case to facilitate the respondent's ability to obtain legal representation" and "participation of a guardian in the proceedings."[27]

The parties accept the BIA's interpretation of what is required by § 1229a(b)(3)—for IJs to impose appropriate safeguards.    The parties do not attempt to distinguish the requirements imposed by that statute from the requirements imposed by the Due Process Clause, namely, providing the safeguards necessary to ensure "notice and a fair opportunity to be heard" and prevent "prejudice."[28]    The parties merely disagree as to whether those standards require the appointment of a guardian in this case.

Retana has not established that the denial of a guardian impacted his opportunity to be heard.    Retana, through counsel, filed a considerable number of motions, introduced evidence, and objected to evidence introduced by the Government.    Retana also has not established that he suffered any prejudice from his lack of a guardian, as he has not made any assertion about how a guardian would have changed the result of the proceedings against him.[29]    This makes sense, as effective counsel can secure many of the benefits provided by a guardian.    The BIA correctly concluded that the IJ's decision to proceed

---

[25] *Id.* at 478.

[26] *Id.* at 481-82.

[27] *Id.* at 483.

[28] *United States v. Villanueva-Diaz*, 634 F.3d 844, 850, 852 (5th Cir. 2011).

[29] *Nguyen v. Dist. Dir., Bureau of Immigr. & Customs Enf't*, 400 F.3d 255, 259 (5th Cir. 2005) (citing *United States v. Benitez–Villafuerte*, 186 F.3d 651, 658-59 (5th Cir. 1999)) ("Demonstration of prejudice requires the alien to show a reasonable likelihood that, but for the errors complained of, he would not have been removed.").

without appointing a guardian did not violate the § 1229a(b)(3) safeguards or Retana's right to due process.

## IV

Retana next contends that the BIA erred in upholding the IJ's denial of his motion for a psychological examination, neurological examination, and IQ test paid for by the Government. The BIA held that Retana's requested examinations were not required because, by the time Retana requested them, "the Immigration Judge had already determined that [Retana] was not competent, and [Retana] has not shown how further examination would safeguard [his] rights in proceedings." The BIA seems to have concluded that there was no need for the requested examinations because Retana intended to use them as evidence of incompetency and the IJ had already found Retana to be incompetent.

Retana responds that he intends to use the additional examinations to establish that he was incompetent on September 7, 2016—the date that he was served and provided the information contained in his I-213. According to Retana, establishing that he was not competent on that date "is vital to the determination of whether service was defective and whether deportability was established."

As far as service is concerned, Retana implicitly argues that the examinations could reveal information that would demonstrate that, on the date of the service of his NTA, the Government was aware of indicia of Retana's incompetency that required it to comply with § 103.8(c)(2). However, Retana argues that the Government failed to comply with § 103.8(c)(2) by failing to serve the warden in person, not by failing to serve the warden in a timely manner. The warden was served in December of 2016—after Retana was found incompetent. Accordingly, the presence of any earlier indicia of incompetency would not alter the service required because § 103.8(c)(2)

already applied.  As a result, Retana has not shown how further examination would safeguard his rights under § 103.8(c)(2), never mind his right to due process.

As far as the establishment of deportability is concerned, Retana argues that the examinations would help safeguard his rights by establishing that he was incompetent when he provided the information in his I-213.  Once this is established, according to Retana, the Due Process Clause prevents the IJ from relying on the information in his I-213.   This argument is unavailing. Immigration officers verified the information Retana provided regarding his birthplace through checks in various databases.  Thus, the Government would have had access to this information even without the statements made by Retana while he was allegedly incompetent.   Furthermore, there is no indication that Retana's statement in the I-213 that he was born in Mexico was incorrect.  Because immigration officers could have obtained this information even without Retana's statement, Retana has failed to establish how further examination could safeguard his right to due process.

## V

Lastly, Retana asserts that the BIA erred by not assigning his appeal to a three-member panel.  This argument is foreclosed by our precedent.  Appeals of IJ decisions are initially assigned to a single Board member.[30]   Under 8 C.F.R. § 1003.1(e)(5), the Board member to whom an appeal is assigned "has the discretion to decide whether the case merits review by a three-member panel.  Assignment to a three-member [panel] is not mandatory even if it meets the criteria under 8 C.F.R. § 1003.1(e)(6)."[31]  We held in *Cantu-Delgadillo v. Holder* that "[b]ecause the decision to designate the case to be heard by a three-

---

[30] *See* 8 C.F.R. § 1003.1(e)(5).
[31] *Cantu-Delgadillo v. Holder*, 584 F.3d 682, 690-91 (5th Cir. 2009).

No. 17-60686

member panel is discretionary, this court lacks jurisdiction to review the BIA's decision."[32]  Accordingly, the BIA did not err in this case by not assigning Retana's appeal to a three-member panel.

*     *     *

For these reasons, the order of the BIA is AFFIRMED.

---

[32] *Id.* at 691.